United States Courts
Southern District of Texas
FILED

*June 18, 2026*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No.** ___**4:26-cr-370**___ |
| | § | |
| **MARIZEL YUKEE** | § | |
| | § | |
| **Defendant.** | § | |

## INDICTMENT

The Grand Jury charges:

## INTRODUCTION

1. Defendant MARIZEL YUKEE, together with her co-conspirators, targeted elderly Medicare beneficiaries, many of whom were terminally ill in hospice care, and caused medically unnecessary amniotic wound allografts to be applied to these vulnerable individuals. MARIZEL YUKEE also paid illegal kickbacks and bribes to providers to induce patient referrals for allograft applications and received illegal kickbacks and bribes from allograft distributors in exchange for purchasing allografts billed to federal health care programs.

2. From in or around October 2023 through in or around April 2026, the Defendant and her co-conspirators submitted more than approximately $906 million in false and fraudulent claims to Medicare and TRICARE for these medically unnecessary allografts and associated services. Medicare and TRICARE paid more than approximately $297 million based on these claims. Through her four clinics, the Defendant submitted an average of over $1 million in claims per Medicare beneficiary for allografts.

3. The Defendant personally profited tens of millions of dollars from the fraud scheme, which she used to fund a lavish lifestyle; purchase several high-end vehicles (including a

$594,000 Ferrari 296 GTS and a $158,000 Cadillac Escalade), luxury jewelry (including a $865,000 Bulgari necklace), and real estate (including a million-dollar home in Hawaii); and fund the construction of a $4.6 million beach resort in the Philippines.

## GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

4.      The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years of age and over or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

5.      Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

6.      Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered, among others, health services provided by skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" covered, among other things, medical items and services provided by physicians, nurse practitioners, group practices, and other qualified health care providers that were medically necessary and ordered by licensed medical doctors or qualified health care providers.

7.      Part A and Part B claims were processed by Medicare Administrative Contractors ("MACs"), each of which had jurisdiction over claims submitted in a specific geographic area.

2

Noridian Healthcare Solutions ("Noridian") was the MAC that covered Nevada, California, and Hawaii, among other U.S. states; and Novitas Solutions ("Novitas") was the MAC that covered Texas, among other U.S. states.

8.     Physicians, nurse practitioners, group practices, and other health care providers (collectively, "providers") that provided items and services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for items and services provided to beneficiaries.

9.     A Medicare claim was required to contain certain information, including: (a) the beneficiary's name; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the ordering, referring, or rendering physician or other health care provider. The claim form could be submitted in hard copy or electronically via interstate wire.

10.     To enroll as a Medicare provider, Medicare required providers to agree to abide by Medicare laws, regulations, and program instructions. Medicare further required providers to certify that they understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with these laws, regulations, and program instructions, including the Federal Anti-Kickback Statute. Medicare paid for claims only if the items and services were medically reasonable, medically necessary for the treatment or diagnosis of the

beneficiary's illness or injury, accurately documented, and provided as represented to Medicare. Medicare would not pay for items and services that were procured through illegal kickbacks.

11.     Medicare covered access to certain bioengineered skin substitutes, including some amniotic membrane allografts made from human placental tissue ("allografts"). These allografts were applied over wounds to assist with wound closure. Medicare reimbursed providers for certain allografts furnished to Medicare beneficiaries only if the allografts were medically reasonable, medically necessary for the treatment or diagnosis of the beneficiary's illness or injury, accurately documented, provided as represented to Medicare, and not procured through illegal kickbacks.

12.     Medicare reimbursed claims for certain allografts under Part B. Allograft manufacturers and labelers were required to report quarterly to Medicare their total sales and units sold to all purchasers in the United States for each allograft product. Based on that data, Medicare calculated the product's Average Sales Price ("ASP"). Before the ASP for an allograft was published by Medicare for a new allograft product on the market, Noridian reimbursed claims for allografts based on the cost that manufacturers and labelers charged providers for allografts for which Medicare had not yet published the ASP.

13.     Beginning in or around June 2022, Noridian required Medicare providers within its jurisdiction to include the "total invoice price" in claims submitted for allografts that did not have a Medicare ASP. Noridian defined the "total invoice price" as the net amount a provider paid for an item or service "taking into account **ALL** discounts, rebates, refunds, or other adjustments."

14.     Beginning in or around November 2022, Noridian required Medicare providers within its jurisdiction to report and return to Medicare any additional amount received by the

4

provider in the form of discounts, rebates, refunds, or other adjustments as overpayments for allografts previously billed to and reimbursed by Medicare that did not have a Medicare ASP. Noridian specified that if a provider, for example, reported and billed Medicare for the total invoice price of an item, resulting in a Medicare payment, and received a rebate or discount after the Medicare payment, the difference between the amount Medicare paid and the rebate or discount received constituted an overpayment. Noridian further specified that providers were required to report all overpayments and refund the overbilled amount to Medicare. Noridian also specified that neither the timing of the rebate nor the form or type of program in which the rebate was presented affected the provider's obligation to pass on the rebate to Medicare.

15.    TRICARE was a federal health insurance program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and their survivors. The Defense Health Agency, an agency of the DOD, was the governmental entity responsible for overseeing and administering TRICARE.

16.    TRICARE offered health insurance benefits for items and services that were medically necessary. TRICARE reimbursed providers based on payment rates from applicable fee and rates schedules. Generally, when a beneficiary was eligible for Medicare and TRICARE, TRICARE was secondary to Medicare.

17.    TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), and affected interstate commerce.

5

## DEFENDANT, RELEVANT INDIVIDUALS, AND RELEVANT ENTITIES

18. Defendant MARIZEL YUKEE was a resident of Las Vegas, Nevada. MARIZEL YUKEE was a nurse practitioner licensed by the State of Nevada and an enrolled Medicare provider. MARIZEL YUKEE owned and controlled Wound Medic LLC ("Wound Medic"), My BestHealth First LLC ("MBH"), AllCare Mobile Wound Treatment LLC ("AllCare"), and Oracle Wound Treatment LLC ("Oracle") (together the "Yukee Clinics").

19. Wound Medic was a limited liability company formed under the laws of Texas, with its principal places of business in Manvel and Pearland, Texas, in the Southern District of Texas. Wound Medic was an enrolled Medicare provider and submitted claims to Medicare for payment.

20. MBH was a limited liability company formed under the laws of Nevada, with its principal place of business in Las Vegas, Nevada. MBH was an enrolled Medicare provider and submitted claims to Medicare for payment.

21. AllCare was a limited liability company formed under the laws of California, with its principal place of business in Harbor City, California. AllCare was an enrolled Medicare provider and submitted claims to Medicare for payment.

22. Oracle was a limited liability company formed under the laws of Hawaii, with its principal place of business in Kahului, Hawaii. Oracle was an enrolled Medicare provider and submitted claims to Medicare for payment.

23. "Company 1" was a limited liability company formed under the laws of Puerto Rico, with its principal place of business in Puerto Rico. Company 1 was a distributor of allografts.

6

Medicare reimbursed claims for allografts distributed by Company 1 at an extremely high rate, exceeding $2,000 per square centimeter for certain allografts.

24.    "Company 2" was a limited liability company formed under the laws of New Jersey, with its principal place of business in Kearny, New Jersey. Company 2 stored and distributed allografts and did business as Company 1. Company 1 and Company 2 operated together as "Distributor 1."

25.    "Company 3" was a limited liability company formed under the laws of Nevada, with its principal place of business in Las Vegas, Nevada. Company 3 was nominally owned by a member of MARIZEL YUKEE's family. Company 3 purported to be a distributor and/or marketer of allografts.

26.    "Individual 1," a family member of MARIZEL YUKEE and a registered nurse, filled various roles at Wound Medic and AllCare.

27.    "Individual 2" was an administrator at a medical facility in Las Vegas, Nevada.

## COUNT ONE
### Conspiracy to Commit Wire Fraud and Heath Care Fraud
### (18 U.S.C. § 1349)

28.    Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

29.    Beginning in or around October 2023, and continuing through in or around April 2026, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas and elsewhere, Defendant

**MARIZEL YUKEE,**

along with other individuals and entities known and unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to commit: wire fraud, in violation of 18 U.S.C. § 1343, and health care fraud, in violation of 18 U.S.C. § 1347; that is, to execute a scheme and artifice to defraud Medicare and TRICARE, which are health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, the health care benefit programs by transmitting and causing to be transmitted by means of wire communication in interstate commerce any writings, signs, signals, pictures, and sounds.

**Purpose of the Conspiracy**

30.    The purpose of the conspiracy was for Defendant MARIZEL YUKEE and her co-conspirators to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare and TRICARE for items and services that were (i) medically unreasonable and unnecessary, (ii) ineligible for reimbursement, and (iii) procured through illegal kickbacks; (b) causing the submission of false and fraudulent claims to Medicare that falsely represented the provider's actual acquisition cost of allografts purchased from Distributor 1; (c) offering and paying illegal kickbacks, bribes, and rebates to induce the referral of patients; (d) soliciting and receiving illegal kickbacks, bribes, and rebates in exchange

8

for purchasing and ordering allografts; and (e) diverting proceeds of the fraud for the personal use and benefit of the Defendant and her co-conspirators, and to further the fraud.

**Manner and Means of the Conspiracy**

31.    The manner and means used by Defendant MARIZEL YUKEE and others to effect the objects of the conspiracy and scheme to defraud included the following:

32.    In or around July 2022, MARIZEL YUKEE enrolled MBH as a Medicare provider. MARIZEL YUKEE certified to Medicare as MBH's Authorized Official that she would comply with all of Medicare's laws, regulations, and program instructions and that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare. MARIZEL YUKEE also certified to Medicare as MBH's Authorized Official that she understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with the Federal Anti-Kickback Statute.

33.    After discovering how profitable MBH was in defrauding Medicare by billing for allografts, MARIZEL YUKEE formed Wound Medic, AllCare, and Oracle to operate and profit in a similar manner.

34.    In or around October 2023, MARIZEL YUKEE enrolled Wound Medic, located in the Southern District of Texas, as a Medicare provider. MARIZEL YUKEE certified to Medicare as Wound Medic's Authorized Official that she would comply with all of Medicare's laws, regulations, and program instructions and that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare. MARIZEL YUKEE also certified to Medicare as Wound Medic's Authorized Official that she understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with the Federal Anti-Kickback Statute.

9

35.     In or around March 2025, MARIZEL YUKEE enrolled AllCare as a Medicare provider. MARIZEL YUKEE certified to Medicare as AllCare's Authorized Official that she would comply with all of Medicare's laws, regulations, and program instructions and that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare. MARIZEL YUKEE also certified to Medicare as AllCare's Authorized Official that she understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with the Federal Anti-Kickback Statute.

36.     In or around June 2025, MARIZEL YUKEE enrolled Oracle as a Medicare provider. MARIZEL YUKEE certified to Medicare as Oracle's Authorized Official that she would comply with all of Medicare's laws, regulations, and program instructions and that she would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare. MARIZEL YUKEE also certified to Medicare as Oracle's Authorized Official that she understood that payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with the Federal Anti-Kickback Statute.

37.     MARIZEL YUKEE and others paid illegal kickbacks and bribes to induce health care providers and owners, officers, employees, and agents of health care entities to refer Medicare and TRICARE beneficiaries to the Yukee Clinics.

38.     MARIZEL YUKEE and others applied allografts to Medicare and TRICARE beneficiaries that were medically unreasonable and unnecessary because, among other reasons, allografts were applied without attempting, completing, or confirming conservative wound care treatment; the wound was infected; the wound had already healed; the wound was not responding to the allografts; the type of allograft applied was selected to maximize profit, not based on the patient's need; and the wounds would not heal because of the terminally ill patients' comorbidities.

10

Some terminally ill patients in hospice care targeted by MARIZEL YUKEE and others died within days of the allograft application.

39.    To conceal and disguise the lack of medical necessity for the allografts, MARIZEL YUKEE falsified, and caused the falsification of, patient medical records to make it appear as though the application of allografts was medically reasonable and necessary and met Medicare requirements, including patient medical records requested as part of audits by Medicare contractors. For example, on or about October 16, 2025, MARIZEL YUKEE emailed an employee of MBH to prepare addenda for patient medical records, some of whom had been treated more than a year previously, and wrote "[Please] add conservative [treatment] to all of them who don't have."

40.    MARIZEL YUKEE, through Company 3, received illegal kickbacks from Distributor 1 in return for Wound Medic and MBH purchasing and ordering, and for Individual 1's and others' arranging for and recommending the purchasing and ordering, of allografts from Distributor 1.

41.    MARIZEL YUKEE directed the company performing billings for the Yukee Clinics to bill the allografts to Medicare at prices that exceeded the amounts MARIZEL YUKEE paid for those allografts, which MARIZEL YUKEE knew to be prohibited by Medicare. For example, MARIZEL YUKEE informed the billing company by email on or about February 26, 2025, for a particular allograft product, "invoice price 1600 charge 3900." As MARIZEL YUKEE and others knew and intended, these false representations in claims to Medicare inflated Medicare's reimbursement paid to the Yukee Clinics for allografts.

42.    MARIZEL YUKEE and others concealed and disguised the false representations in claims to Medicare regarding the price the Yukee Clinics paid for allografts through sham

invoices. For example, on or about August 30, 2024, MARIZEL YUKEE requested from Distributor 1 via email "invoices needed by Medicare" that reflected false, inflated prices compared to what MARIZEL YUKEE actually paid for the allografts.

43.     From in or around October 2023 through in or around April 2026, the Yukee Clinics submitted over approximately $875 million in claims false and fraudulent claims to Medicare for allografts and associated services. Medicare paid the Yukee Clinics over approximately $293 million based on those claims.

44.     From in or around October 2023 through in or around April 2026, the Yukee Clinics submitted over approximately $31 million in false and fraudulent claims to TRICARE for allografts and associated services. TRICARE paid the Yukee Clinics over approximately $4 million based on those claims.

45.     From in or around January 2024 through in or around January 2025, Company 3 received approximately $15,951,140 in illegal kickbacks from Distributor 1.

46.     MARIZEL YUKEE used these illegal proceeds to fund a lavish lifestyle and purchase several high-end vehicles (including a $594,000 Ferrari 296 GTS and a $158,000 Cadillac Escalade), luxury jewelry (including a $865,000 Bulgari necklace, depicted below), real estate (including a million-dollar home in Hawaii), and a $3 million certificate of deposit. MARIZEL YUKEE also used the illegal proceeds to pay approximately $4.6 million to construct a beach resort in the Philippines, a rendering of which is depicted below.




All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH THREE
### Health Care Fraud
### (18 U.S.C. §§ 1347, 2)

47.    Paragraphs 1 through 27 are re-alleged and incorporated by reference as though fully set forth herein.

48.    Beginning in or around October 2023, and continuing through in or around April 2026, in the Southern District of Texas and elsewhere, Defendant

**MARIZEL YUKEE**,

along with other individuals and entities known and unknown to the grand jury, in connection with the delivery of, and payment for, health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare and TRICARE, which are health care benefit programs as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, the health care benefit programs.

13

**Purpose of the Scheme**

49.     Paragraph 30 above is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the scheme.

**Manner and Means of the Scheme**

50.     Paragraphs 31 through 46 above are incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the scheme.

**Executions of the Scheme**

51.     On or about the dates specified below, in the Southern District of Texas and elsewhere, Defendant MARIZEL YUKEE, aided and abetted by, and aiding and abetting, others known and unknown to the grand jury, submitted and caused to be submitted the following false and fraudulent claims to Medicare for allografts that were medically unreasonable and unnecessary, ineligible for reimbursement, and procured through illegal kickbacks and bribes, in an attempt to execute, and in execution of, the scheme as described in paragraphs 1 through 27 and 31 through 46 above, with each execution set forth below forming a separate count:

| Count | Approximate Claim Date of Service | Approximate Claim Submission Date | Medicare Patient | Billing Entity | Approximate Amount Billed to Medicare |
|-------|-----------|-----------|-----------|-----------|-----------|
| 2 | 5/9/2024 | 6/7/2024 | A.B. | Wound Medic | $10,800 |
| 3 | 2/25/2025 | 6/4/2025 | M.C.C. | Wound Medic | $15,600 |

Each in violation of 18 U.S.C. §§ 1347 and 2.

**COUNT FOUR**
**Conspiracy to Defraud the United States and**
**Offering, Paying, Soliciting, and Receiving Health Care Kickbacks**
**(18 U.S.C. § 371)**

52.     The factual allegations in paragraphs 1 through 27 are incorporated by reference and re-alleged as though fully set forth herein.

14

53.    Beginning in or around October 2023 and continuing through in or around January 2025, in the Southern District of Texas and elsewhere, Defendant

**MARIZEL YUKEE**,

along with other individuals and entities known and unknown to the grand jury, knowingly and willfully agreed and conspired with each other and others to: defraud the United States by cheating the United States government and any of its departments and agencies out of money and property, and by impairing, impeding, obstructing, and defeating through deceitful and dishonest means the lawful government functions of HHS and CMS in their administration and oversight of Medicare, and DOD in its administration and oversight of TRICARE; soliciting and receiving illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1); and offering and paying illegal kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(2).

## Purpose of the Scheme

54.    Paragraph 30 above is incorporated by reference and re-alleged as though fully set forth herein as the purpose of the scheme.

## Manner and Means of the Scheme

55.    Paragraphs 31 through 46 above are incorporated by reference and re-alleged as though fully set forth herein as the manner and means of the scheme.

## Overt Acts

56.    In furtherance of the conspiracy, and to effect the objects of the conspiracy, Defendant MARIZEL YUKEE and her co-conspirators committed and caused to be committed various overt acts in the Southern District of Texas and elsewhere, including but not limited to the following:

a.      On or about February 14, 2024, Individual 2 requested via text message flights and a hotel from MARIZEL YUKEE and stated, "Once I get that I will give u your first 3. To 5 patients."

b.      On or about February 14, 2024, MARIZEL YUKEE purchased flights for Individual 2 and Individual 2's companion.

c.      On or about March 20, 2024, MBH submitted a total of $173,060 in claims to Medicare for allografts applied on February 19, 2024, to beneficiary D.L., who was receiving other treatment at the facility where Individual 2 worked.

d.      On or about July 3, 2024, Individual 1 sent an email on behalf of Wound Medic requesting approximately 66 allografts in various sizes from Distributor 1. The email went to Company 3, who forwarded it to Distributor 1.

e.      On or about August 30, 2024, MARIZEL YUKEE requested from Distributor 1 via email "invoices needed by Medicare" that reflected false, inflated prices compared to what MARIZEL YUKEE actually paid for the allografts.

f.      On or about September 12, 2024, Wound Medic, from its bank account ending in 5287, paid approximately $2,113,200 for the order requested in Individual 1's July 3 email.

g.      On or about September 20, 2024, Company 3 received an illegal kickback in the approximate amount of $939,158 from Company 1's bank account ending in 2980.

h.      On or about October 2, 2024, a managing partner of Company 1 sent a spreadsheet to an individual associated with Company 3 containing details of Company 3 "accounts," including amounts of allografts ordered by Wound Medic and MBH per month, invoiced amounts, amounts paid, and columns related to Company 3's "commissions." The spreadsheet identified a $939,200 "commission" payment to Company 3 for the July 3, 2024, order as paid on September 20, 2024.

i.      On or about October 16, 2025, MARIZEL YUKEE emailed an employee of MBH to prepare addenda for patient medical records, some of whom had been treated

16

more than a year previously, and wrote "[Please] add conservative [treatment] to all of them who don't have."

All in violation of 18 U.S.C. § 371.

**COUNT FIVE**
**Transactional Money Laundering**
**(18 U.S.C. §§ 1957, 2)**

57.    The factual allegations in paragraphs 1 through 27 and 31 through 46 are incorporated by reference and re-alleged as though fully set forth herein.

58.    On or about the approximate date set forth below, in the Southern District of Texas and elsewhere, Defendant

**MARIZEL YUKEE**,

aided and abetted by, and aiding and abetting, other individuals and entities known and unknown to the grand jury, in the Southern District of Texas and elsewhere, knowingly engaged and attempted to engage in the following monetary transaction in the United States with criminally derived property of a value exceeding $10,000, derived from specified unlawful activity, namely conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, health care fraud, in violation of 18 U.S.C. § 1347, conspiracy to defraud the United States and pay and receive illegal health care kickbacks, in violation of 18 U.S.C. § 371, and paying and receiving illegal health care kickbacks, in violation of 42 U.S.C. § 1320a-7b(b):

| Count | Approximate Date | Originating Account | Transaction | Approximate Amount |
|---|---|---|---|---|
| 5 | 6/10/2025 | JPMC Wound Medic Account x1285 | Certificate of Deposit Purchase | $3,000,000 |

In violation of 18 U.S.C. §§ 1957 and 2.

17

## CRIMINAL FORFEITURE
### (18 U.S.C. §§ 982(a)(7) and (a)(1))

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice to the Defendant that in the event of conviction of the criminal offense charged in any of Counts 1 through 4 of this Indictment, all property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to such offenses, is subject to forfeiture.

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the Defendant that in the event of conviction of the criminal offense charged in Count 5 of this Indictment, all property, real or personal, involved in the money laundering offense or traceable to such property, is subject to forfeiture.

The property subject to forfeiture includes, but is not limited to, the following specific property:

Real Property

a.   131 W. Papa Ave., Kahului, HI 96732;

b.   404 N. Royal Ascot Dr., Las Vegas, NV 89144;

c.   4540 S. Money St., Pahrump, NV 89048;

d.   6153 Cromwell Ave., Las Vegas, NV 89107;

e.   6431 W. Sahara Ave., Las Vegas, NV 89146;

f.   6607 Casa Linda Dr., Las Vegas, NV 89103;

g.   2743 Smith Ranch Rd., Pearland, TX 77584;

h.   7750 Abalone Bay St., Las Vegas, NV 89139; and

i.   Funds sent for construction of the "Ultra Coastal Beach Resort" in Santa Ana, Cagayan, Philippines, and the real property traceable thereto.

18

Seized Vehicles

|  | Year | Make | Model | VIN | State |
|---|---|---|---|---|---|
| (A) | 2026 | Mercedes Benz | AMG GLC43 | W1NKJ8HB9TF449794 | NV |
| (B) | 2025 | Ferrari | 296 GTS | ZFF01SMA2S0319450 | NV |
| (C) | 2025 | Ford | Bronco | 1FMEE0RR5SLA53976 | HI |
| (D) | 2024 | Cadillac | Escalade | 1GYS4GKL8RR221278 | NV |
| (E) | 2024 | Tesla | Y | 7SAYGDEF9RF132503 | NV |
| (F) | 2024 | Tesla | X | 7SAXCBE65RF450503 | NV |
| (G) | 2024 | Porsche | Cayenne | WP1BL2AY0RDA60266 | NV |
| (H) | 2024 | Toyota | 4Runner | JTEDU5JR0R5312623 | TX |

Seized Funds

|  | Financial Account | Approx. Amount Seized |
|---|---|---|
| 1. | JPMorganChase Acct x3838 - AllCare Mobile | $6,893,662.97 |
| 2. | JPMorganChase Acct x3839 - AllCare Mobile | $269,002.13 |
| 3. | JPMorganChase Acct x3591 - Derm Life | $22,545.40 |
| 4. | JPMorganChase Acct x8228 - Derm Life | $310,337.30 |
| 5. | JPMorganChase Acct x8325 - Derm Life | $5,426,525.47 |
| 6. | JPMorganChase Acct x9838 - Health & Humanity | $1,831,450.23 |
| 7. | Bank of America Acct x5596 | $184,675.10 |
| 8. | Bank of America Acct x8428 | $1,746,389.94 |
| 9. | JPMorganChase Acct x0119 | $283,578.49 |
| 10. | JPMorganChase Acct x2955 | $500,079.66 |
| 11. | JPMorganChase Acct x8903 - My BestHealth First | $684,864.52 |
| 12. | JPMorganChase Acct x5371 - My BestHealth First | $934,319.49 |
| 13. | JPMorganChase Acct x0986 - Oracle Wound | $786,762.07 |
| 14. | JPMorganChase Acct x0988 - Oracle Wound | $453,257.54 |
| 15. | JPMorganChase Acct x0472 | $115,026.80 |
| 16. | JPMorganChase Acct x1285 - Wound Medic | $211,555.04 |
| 17. | JPMorganChase Acct x5287 - Wound Medic | $321,230.98 |
| 18. | JPMorganChase Acct x9595 - Wound Medic | $664,212.30 |
| 19. | JPMorganChase Inv. Acct x3265 | $205,181.76 |
| 20. | JPMorganChase Inv. Acct x8058 | (varies) |
| 21. | JPMorganChase Inv. Acct x8059 | (varies) |
| 22. | JPMorganChase Inv. Acct x8060 | (varies) |
| 23. | JPMorganChase Inv. Acct x5256 - Wound Medic | (varies) |
| 24. | JPMorganChase Inv. Acct x8887 - Wound Medic | $93,408.75 |

19

| 25. | Bank of America Inv. Acct x5379 | $250,398.99 |
| 26. | United States Currency seized on May 20, 2026 | $467,253.00 |

## Money Judgment and Substitute Assets

The United States will seek imposition of a money judgment against the Defendant. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the Defendant in substitution up to the amount of the money judgment.

A TRUE BILL
Original Signature on File

_____
FOREPERSON

JOHN G.E. MARCK
ACTING UNITED STATES ATTORNEY

LORINDA LARYEA, CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
ADAM TISDALL
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

20